Lyda TIDWELL, individually, Lyda Tidwell, as Co-trustee and Lyda Tidwell, as beneficiary under Richman Trust, Plaintiff,

v.

Frederick I. RICHMAN, individually; Frederick I. Richman, as Co-trustee under Declaration of Trust dated November 1, 1945, and amendments thereto; Frederick I. Richman, as Agent of Co-trustees under Declaration of Trust dated November 1, 1945, and amendments thereto; J. B. Witt, Witt Ice and Gas Co., a California corporation; Modern Machine Works, a California corporation; Consolidated Mortgage Co., a California corporation; Formula Products, a California corporation; Betty Pomy, also known as Mrs. Theodore Lerberg; Theodore Lerberg; Doe I to XX, individuals; Roe I Corporation to IX Corporation, Corporations Doe I to Doe V, a partnership, partnerships, Defendants.

Civ. A. No. 13742.

United States District Court,
S. D. California, Central Division.
Nov. 30, 1953.

■■■■■■■■■■■■■■■■■

Lyda Tidwell in pro. per. and William P. Camusi, Laurence B. Martin, of Martin, Hahn & Camusi, Los Angeles, Cal., for plaintiff.

Frederick I. Richman, in pro. per., Joseph T. Enright, Walter L. Nossaman, Joseph L. Wyatt, Jr., of Brady, Nossaman & Paulston, Los Angeles, Cal., for defendants Frederick I. Richman, individually, as agent, and as trustee, Witt Ice & Gas Co., Modern Machine Works, Consolidated Mortgage Co., Formula Products Co., Mrs. Theodore Lerberg, formerly Betty Pomy, and Theodore Lerberg.

TOLIN, District Judge.

This is an action between Lyda Tidwell and Frederick I. Richman each of whom is a trustee and trustor under a declaration of trust. Plaintiff has brought suit asking this Court to permit her to void the declaration of trust and for a distribution of the assets of the estate to the trustors. She claims that the trust is a voidable one because of (1) undue influence in the inception; (2) fraud in the inception; (3) fraudulent and improper management; and (4) that after the establishment of the trust it has been fraudulently and wrongfully managed by the defendant to such an extent that he should be removed as agent of the trustees and the trust should be terminated.

At a pretrial conference the Court ordered a trial upon the single issue of whether there was undue influence or fraud or both which moved plaintiff to execute the declaration of trust. It was held by the Court that if plaintiff prevail on this issue, there need not be a trial as to the later issue except as it might become involved in distribution of the estate to the persons entitled thereto and in an accounting which would necessarily be involved. Plaintiff has objected to this procedure on the basis that a showing of certain acts of mismanagement (which she claims she is able to show) will relate back to the things which were done before she executed the trust declaration, and will show that certain privileges of management which defendant has under the trust declaration were in fact set up as they are in order to enable him to do the supposedly high-handed and improper acts of which she accuses him. The order of the Court relating to the separation of issues for trial is a provisional one. It provides for a trial upon the issue of voidability of the

trust because of undue influence and fraud in the inception. Evidence of how the trust has been managed since it has been created has been specifically excluded from the trial of the issue regarding undue influence and fraud in the inception. The Court has ruled that if plaintiff prevail upon the theory thus being tried, the only need to go into acts of management will be in the accounting. The ruling was that if plaintiff cannot establish her cause of action upon the theory of wrong in the beginning, the Court will still hold open its findings in that regard so that if any evidence received in the course of trying the issue of post execution management and alleged fraud be relevant to what has been termed the First Issue, the Court would not have foreclosed itself from consideration thereof in making its findings. This has brought the case to trial in a posture where potentially plaintiff might make out her case on trial of the First Issue and establish a right to voiding the declaration of trust and distribution of the assets with an accounting. If the evidence be insufficient for that purpose, she still would have a right, under the terms of the order severing issues for trial, to continue to try fraud in the inception during the trial of the issue of mismanagement and fraud on the part of the agent after the trust was executed. Trial of the First Issue has occupied in excess of 19 days of testimony and argument. It therefore readily appears that trial of the other referred to issues would also be extensive and that it has been provident to sever the issues in order to conserve trial time with its attendant expense to the litigants. It now appears that plaintiff has made out her case on her theory of undue influence in the inception of the arrangement, and the only reason for setting forth the limitations immediately above described is to explain to any reviewing court that this case has been tried upon a limitation as described.

The creation of the trust arises out of many circumstances which include the fact that Mrs. Tidwell and Mr. Rich-man were the immediate descendants of parents who left considerable wealth.

Early in the occurrence of circumstances which led to execution of the declaration of trust, Lyda Tidwell was known as Lyda Blythe Richman Nagel. She was at that time the wife of one Nagel whom she thereafter divorced. She later married Albert Ray Tidwell, with her brother's grumbling acceptance of the union. The brother has always considered him one of the host of fortune hunters whom he continually feared as threats to the inheritance. She is a woman well educated in Liberal Arts, having been graduated from well-respected schools, and holds some academic degrees indicating advanced education. Her education has been predominantly in language and literature. Following graduation from the last of the schools which she attended, she was employed for a time by the State of California in one of the relief agencies which existed during the depression years. Her position was that of case worker and at one time she was a supervisor of case workers. Apparently she did well in that employment. She has taught school in one of the South American countries where she instructed children of resident American Nationals. Since her return she has delivered public lectures on her observations and experiences in travel.

Although making no claim to being a woman of great physical beauty, Mrs. Tidwell is nonetheless a person of considerable personal charm and attraction. It would be expected that if she were without estate, she would still be appealing as a prospect for matrimony. This is important here because of defendant's long-term insistence that it is not true. Defendant Frederick I. Richman is her only sibling. He is older, much more aggressive, and a successful member of the California State Bar. His very considerable learning and ability in the law and handling of property brought him to a position where his parents had considerable trust in him as an advisor concerning their own affairs, and they manifested a great deal of pride in the

ability and progress of their son. Throughout her youth, Mrs. Tidwell (first as Lyda Blythe Richman, and later as Lyda Blythe Richman Nagel) held a young sister's considerable admiration for the very real and proudly recognized accomplishment and senior standing in the family of her Stanford-trained lawyer brother. She thought of herself as educated in the gentle arts and of defendant as a wise, technically trained master of practical estate problems. He was actually a man of somewhat testy and domineering disposition, inclined to be critical of his younger sister's habits and friends. While she looked up to him, he looked down upon her. The parents, who were in declining years (the father having already suffered a stroke and being under some disability) had need to rely for some guidance in legal and property affairs, and often looked in part to their accomplished son for that guidance. Mrs. Tidwell often accompanied her father and brother on errands to a rental property. She sometimes even collected some rents but never became, nor was trained to become, a manager of income property. The culture which had been acquired by their daughter Lyda was in the classical type of education. The brother had developed his natural talents to the extent that he was a capable, well-trained lawyer, having special acquaintance with trust and related matters. He was given to making sharp taunts toward his sister, expressing to her that she lacked physical charm and possessed physical disabilities (which were really non-existent unless she has recently been remarkably reconstructed) that would make her undesirable in the marriage market except to a fortune hunter to whom she would have strong attraction solely because of the substantial nature of her then prospects of inheritance and later realization of those prospects. The evidence indicates that Mr. Richman did believe that his sister would be naturally attractive to fortune hunters and did tend to regard her male friends as either casual acquaintances or direct seekers for her financial bounty. He pointedly emphasized his view that no one else would be interested in her. He did consider himself (rightfully so) a very well educated and capable lawyer. This accomplishment was continually in plaintiff's mind.

Mrs. Tidwell, during the time that she was Mrs. Nagel and subsequently unto the present time, has been plagued with occasional, but sometimes very substantial, legal problems. She did not get along well with her first husband and ultimately divorced him. There was a property settlement in the course of dissolution of that unhappy marital union. She lacked education and schooling in tax matters and her lawyer brother possessed them to a high degree. He acted as her attorney in the liquidation of her marital problem and in the making of her tax returns. The evidence shows that *whenever she needed a lawyer, she turned to her brother who was ever available,* competent and, while a little patronizing toward his sister, efficient in handling her legal needs. The parents had been careful, prudent and efficient in putting their affairs in order during their retirement. They were trustors under a declaration of trust and although the evidence is meager on the point, it is uncontradicted that considerable saving in expense in the after death settlement of their affairs was accomplished by the fact that said trust was in existence. There is evidence that plaintiff at one time told her brother that since so much in the way of property costs and taxation had been saved by the parents' trust, it would be advantageous for the brother and sister (now plaintiff and defendant in this action) to have a similar trust. The whole sum of evidence, however, adds up to the fact that the brother, in early life, gained something of a mastery over his sister's will in connection with her thoughts concerning her estate and that the real suggestion that there be a trust between these siblings, of divergent personality and objectives, was adroitly suggested by the brother. It appears that he always thought of the estate as something to be guarded, built up, and essentially kept intact (although the properties of

which it consisted might be sold or exchanged). His thought was to hold the basic fortune and some of its increment together. Her philosophy was that she was a woman of means and might as well spend some of it. There is no suggestion in her conduct of financial profligacy, but her brother was, and still is, constantly fearful of dissolution of the estate he has seen and helped grow. He abhors her plan to give up the secure income derived from a good apartment property and collaborate with her husband in development of a more venturesome business. It is true that the mere fact of brother and sister relationship does not in itself create a fiduciary status. It may well be, and in this case was, one of the ingredients in a fact situation leading to the creation of such a relationship. See Johnson v. Clark, 7 Cal.2d 529, at pages 534–535, 61 P.2d 767, at page 769:

"Plaintiff and defendant are sisters. The relation between sisters is not *presumed* to be confidential, as is the relation between husband and wife, parent and child, attorney and client, but a confidential relation between sisters may be shown to exist. [Citing cases.] Blood relationship is an important factor in determining whether in fact a confidential relationship existed. [Citing case, supra.] Where it is established as a fact that a confidential relation exists between sisters, the rules governing confidential relations apply, and a presumption of undue influence arises from any transaction by which the person in the superior position gains an advantage over the other. [Citing cases.] Such transactions are constructively fraudulent, and the burden is cast upon the party who has gained the advantage to show fairness and good faith in all respects. [Citing cases.]". (Emphasis in quoted material.)

To similar effect is Odell v. Moss, 130 Cal. 352, at page 356, 62 P. 555 at page 556, where it was said:

"The relationship of brother and sister is not in itself a fiduciary relation, but it is a material circumstance in considering the question whether in fact such a relation existed. * * *".

Having observed and heard the brother and sister as they related their stories, each subjected to searching cross-examination, and also having in mind the testimony of other witnesses who testified to the point, the Court finds that a fiduciary relationship existed between brother and sister in the instant situation, from at least the time plaintiff became of age.

A still more definitely defined fiduciary relationship has existed at all times pertinent to the transactions in question because of an attorney and client relationship which began during the domestic trouble of plaintiff with her first husband and continued until shortly before plaintiff brought this action.

The basic rule is stated in 6 California Jurisprudence 2d 306, where Section 137 says:

" * * * The attorney's relation to his client is both fiduciary, committing the attorney to the most scrupulous good faith, * * *".

This is treated more fully at pages 317–319 of the same work where Section 142 says:

" * * * An attorney at law is not prohibited from entering into any business transaction with a client, touching or not touching the subject matter professionally entrusted to him by the client. Such transactions are, however, subject to a close scrutiny, and they must be shown to be fair in all respects. The attorney must prove that he has given to the client all that reasonable advice against himself that he would have given him against a third person regarding a similar transaction. Some cases go even further by holding that the client is entitled to advice independent from that of the attorney though also stating that this

element alone is not conclusive. The attorney is thus charged with the so-called presumption of undue influence.

"The presumption is based on the fiduciary character of the attorney-client relationship, and on a statutory provision to the effect that all transactions between a trustee and his beneficiary, by which the trustee obtains any advantage, are presumed to be entered into without any consideration and under undue influence. That statute is applicable to the attorney-client relationship. The presumption is to the effect that 'undue influence' was used by the attorney in inducing the client to enter into the transaction, and that he did not give sufficient consideration to the client. This does not mean, however, that a total want of consideration is presumed. And, even where the presumption applies, and has not been rebutted, the transaction involved is not void, but merely voidable. A typical example of the application of the presumption of undue influence is the case of a will, drafted for a client by an attorney or under his direction or influence, whereby a disposition is made in favor of the attorney."

It is of importance to measure the facts of the case against a rule stated in Section 143 of the same Chapter, at pp. 320–321, as follows:

" * * * The presumption of undue influence is applicable only to contracts entered into while the attorney-client relationship exists; it does not apply to contracts which create the relationship. In negotiating the terms of the attorney's employment, the prospective client deals with the attorney at arm's length. * * * "

It is uncontradicted that plaintiff consulted defendant whenever she needed counsel, and there is no doubt but that a general relationship of attorney and client existed at the time critical to the present transaction.

It is plain that plaintiff had ample counsel, and while this was entirely proper, possibly necessary and, in any event, wise, it is striking that in entering into the arrangement to which defendant now seeks to hold plaintiff for life, the plaintiff relied entirely upon defendant. Under the circumstances which created a fiduciary relationship upon two separate bases (*amplified* older brother and younger sister and attorney-client), it was the definite duty of Mr. Richman to insist that his sister have independent legal counsel before extending the general relationship of attorney and client into a lifetime employment of the attorney. This he not only did not do but tended to discourage while paying slight and nominal lip service to the principle.

This leads to a consideration of whether he has carried his burden. Very definitely he has not. He intended to and did secure an advantage. He obtained a lifetime contract of employment at a rate of compensation which, if not absolutely excessive, was at least in the upper limits of charges, and provided for permanent employment at fees which would not have been agreed to by one looking for a trustee in an open competitive market.

Some apt language on the general duty of defendant appears in Bacon v. Soule, 19 Cal.App. 428, at page 434, 126 P. 384, at page 385:

"The law relating to the subject of confidential relations has been so often declared and is generally so well understood that a mere reference to its underlying principles will suffice for the discussion and decision of the paramount point presented upon this appeal. A 'confidential relation' in law may be defined to be any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntari-

ly accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. A 'fiduciary relation' in law is ordinarily synonymous with a 'confidential relation.' It is also founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed. Civ. Code, § 2219; [*citing cases*]. Confidential relations are presumed to exist between husband and wife, partners, and parent and child, priest and parishioner, principal and agent, guardian and ward, counsel and client, etc., and in each of said relations the party in whom the confidence is reposed must stand in his dealings with the other party unimpeached of the slightest abuse of the confidence reposed, and if he derives or claims any advantage from the relation, the law places upon him the burden of showing that the transaction out of which the advantage arose was fair and just and fully understood and consented to by the party confiding in him. * * * "

See also, Matter of Danford, 157 Cal. 425, at page 429, 108 P. 322, at page 324:

" * * * The relation between attorney and client is 'a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity-*uberrima fides*.' Cox v. Delmas, 99 Cal. 104, 123, 33 P. 836. It is one which precludes the attorney from obtaining any personal advantage by abusing the confidence reposed in him by his client. In re Burris, 101 Cal. 624, 36 P. 101. * * * "

It is true that Danford charged high fees for services not rendered, but this is so close to charging higher fees for actual services, than is ordinarily charged for such services, that the same principle is involved here although in a different degree.

As the relationship was already in existence and related to future services, the exceptions mentioned in Cooley v. Miller & Lux, 156 Cal. 510, 105 P. 981, will not save defendant but the general rules therein stated must be applied against him. See that case, 156 Cal., at pages 523, 524, 105 P. at page 986:

"The rule is well established that the relation of attorney and client is confidential in character and that any contract entered into between them while that relation continues whereby the attorney obtains an advantage from the client, is presumed to have been made by the client under the undue influence of the attorney. Kisling v. Shaw, 33 Cal. [425,] 440, 91 Am.Dec. 644; Civ.Code, § 2235; 1 Story's Eq.Jur. §§ 310, 311; 2 Pom.Eq.Jur. § 390. In the section cited Mr. Pomeroy says: 'The presumption always arises against the validity of a purchase or sale between the client and attorney made during the existence of the relation. The attorney must remove that presumption by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, knowledge, intention, and freedom of action by the client, and also, that he gave his client full information and disinterested advice * * * If all these circumstances are proved, the contract will stand; if not, it will be defeated or set aside.' The presumption does not apply to a transaction in which the attorney openly assumes a hostile attitude to his client. Johnson v. Fesemeyer, 3 DeG. & J. 22. Nor is it applicable to a contract by which the relation is originally created and the compensation of the attorney fixed. The confidential relation does not exist until such contract is made, and in agreeing upon its terms the parties deal at arm's length. * * * "

See also, Felton v. Le Breton, 92 Cal. 457, at page 469, 28 P. 490, at page 493:

> "While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of, or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere instance of the client unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised. [Citing cases.] In the words of Lord Eldon, he must make it manifest that he gave to his client 'all that reasonable advice against himself that he would have given him against a third person.' * * * "

The declaration of trust was, and is, voidable; and as plaintiff has sued to set it aside for the foregoing reasons, the Court holds that she has established her case, and the corpus of the trust shall be distributed according to the interests of the trustors. All questions and matters, except that the trust be set aside and the corpus distributed, are expressly reserved to be treated in further proceedings here in the administration of a distributing receivership which will be ordered concurrently with this memorandum.

Defendant has contended ratification, waiver and operation of the Statute of Limitations, because of certain amendments made to the declaration, and certain consultations between plaintiff and attorneys in New Mexico.

The simple answer to all such questions is that the first legal consultations were had respecting substitution of beneficiaries upon plaintiff's death and did not go at all to the subject herein litigated.

Acts which will amount to undue influence arising from an elaborated brother-sister relationship are ordinarily of long rather than brief accumulation. Undue influence did not occur here in a day. It grew out of a succession of acts, long-continued attitudes and a sequence of events which covered a long period of time. Conversely, it did not terminate suddenly. Plaintiff was still under its influence when she first went to Mr. Jones (her New Mexico attorney) and her employment of him did not search out the vice in her brother's conduct or in the declaration of trust (which was in proper form—for many others but not this case). Plaintiff remained under the spell of undue influence until very shortly before the action was filed. She did not know the extent of advantage her brother had obtained until she asked him to renounce it. It was to her a still not fully known quantity. She could not ratify what she did not understand.

Although it is clear that at all times before learning the extent to which she empowered defendant, plaintiff desired there be a trust, the facts compel a finding that the advantages given her brother in the trust indenture, and the rights surrendered to him by her therein, were not fully explained to her or understood by her. By reason of defendant's long-standing attitude toward her, including his depreciation of her marriageability (except to an ill-motivated fortune hunter) she was, at the time she became a trustor, in that condition of subordination of her will to him which is colloquially described as "beaten down". Although she has now emerged from that state of being dominated, she came out of it slowly, just as an anesthetized person slowly returns to full control of conscious action. It cannot be said that she ratified a single one of defendant's acts

*after* she became free from his domination, or understood fully the trust instrument which was so disadvantageous to her *right* to have funds for less conservative investment, if she so chose, and which gave him absolute control at high fees.

It is established that the three-year period of limitation of Section 338, Subsection 4, of the Code of Civil Procedure which provides that the cause is not "deemed to have accrued until the discovery" applies to cases of constructive fraud and undue influence. Neet v. Holmes, 25 Cal.2d 447, 154 P.2d 854; Sears v. Rule, 27 Cal.2d 131, 163 P.2d 443; Victor Oil Co. v. Drum, 184 Cal. 226, 239, 193 P. 243.

Where there is a confidential relationship and the *cestui* places reliance on the fiduciary, the statute does not commence to run until the time of discovery of the fraud. Hansen v. Bear Film Co. Inc., 28 Cal.2d 154, 168 P.2d 946.

Rottman v. Rottman, 55 Cal.App. 624, states a rule, at page 632, 204 P. 46, at page 50, which the Court need not apply here but which answers many of defendant's contentions:

> " * * * Another rule stated in the books is that the doctrine of laches is not strictly applied between near relatives * * * ".

See also, Bailey v. New England Mut. Life Ins. Co., D.C., 35 F.Supp. 1007, at page 1010:

> " * * * *Accepting the agreement in the belief that the deceased was dealing honestly with her*, she was justified in resting in that belief, and was not called upon then or thereafter to make independent inquiry as to his good faith. * * * " (Emphasis in quoted material.)

and Sibert v. Shaver, 111 Cal.App.2d 833, 245 P.2d 514; Craig v. White, 187 Cal. 489, 202 P. 648; Feckenscher v. Gamble, 12 Cal.2d 482, 85 P.2d 885.

Counsel for plaintiff will prepare findings of fact, conclusions of law, and judgment, which shall provide for distribution of the estate as the interests of the parties in the corpus shall be determined by an accounting.